**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM MULLEN**<br>**Plaintiff,**<br>**v.**<br>**WELLS FARGO BANK, N.A., *et al*.**<br>**Defendants.** | **CIVIL ACTION NO. 19-3995** |

**MEMORANDUM OPINION**

**Rufe, J.** **September 29, 2021**

Plaintiff William Mullen has sued his former employer, bringing claims of discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964; disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"); interference and retaliation under the Family and Medical Leave Act ("FMLA"); and claims under the Pennsylvania Human Relations Act ("PHRA").[1] Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") have moved for summary judgment on all claims, and Mullen has moved for partial summary judgment on the question of whether his sex was a motivating factor in the adverse employment action. For the reasons explained below, Mullen's motion will be denied, and Wells Fargo's motion will be granted in part and denied in part.

---

[1] The Complaint does not state specifically whether the claims under the PHRA relate to the allegations of discrimination on the basis of sex, disability discrimination, or both. *See* 43 Pa. Cons. Stat. § 952. In Plaintiff's motion for partial summary judgment, he refers to the PHRA only in connection with the disability-related claims. Doc. No. 26 at 2 n.1. As the liability standards for PHRA track those of Title VII and ADA claims, the Court will not discuss the PHRA separately. *See, e.g.*, *Beradelli v. Allied Servs. Inst. of Rehabilitation Med.*, 900 F.3d 104, 125–26 (3d Cir. 2018) (holding that "the liability standard for the PHRA and the ADA is the same"); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n.8 (3d Cir. 2016) (holding that Title VII and the PHRA are assessed under the same standards); *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 (3d Cir. 2006) (construing Title VII and the PHRA "consistently").

## I. BACKGROUND

Mullen began working as a business relationship manager for Wells Fargo in 2010, after working for Wells Fargo's predecessor banks from 1979 through 2006 and for an unrelated bank from 2006 through 2010. Because Mullen was employed elsewhere for more than six months, his year of hire for seniority purposes was 2010.[2] In 2011, Mullen was promoted to the position of business acquisition manager ("BAM"), with responsibility for Pennsylvania, Delaware, and southern New Jersey. In 2014, Lisa Bono also was promoted to the BAM position, and Plaintiff's territory was divided in two, with Bono responsible for the Greater Pennsylvania area (outside of Philadelphia). Plaintiff interviewed Bono for the role and recommended her selection.[3] Bono had worked for Wells Fargo or its predecessor banks continuously since 1996.

In April 2016, Mullen was seriously injured in a car crash and took medical leave until September 2016. It is undisputed that Mullen suffers from disabilities as a result of the crash.[4] Mullen took additional leave in October 2016 after a hernia operation. In 2017, southern New Jersey was removed from Mullen's territory and assigned to Jeff Lenches. That same year Plaintiff's supervisor, Mark Massey, was terminated and Plaintiff began reporting directly to Ralph Richard, another business banking manager.[5]

Wells Fargo has produced evidence that in June 2017, a decision was made to eliminate one of the Pennsylvania BAM positions, as there were two in Pennsylvania but only one for the New York/Connecticut and New Jersey areas. Thus, either Mullen or Bono was slated for

---

[2] Defs.' Statement of Facts ¶¶ 8-10 [Doc. No. 27-1] .

[3] Defs.' Statement of Facts ¶ 26 [Doc. No. 27-1].

[4] Defs.' Statement of Facts ¶¶ 30-31 [Doc. No. 27-1].

[5] Massey was re-employed by Wells Fargo in 2018 for a position in Dallas, Texas. Massey Dep. [Doc. No. 29-4 Ex. 4] at 9. When Massey was placed on a performance improvement plan before his termination, the plan stressed that there had been insufficient focus on non-credit opportunities and working with internal product partners. Defs.' Mot. Summ. J. at Ex. K [Doc. No. 27-2].

termination.[6] The decision was approved by John Cole, the Northeast Business Banking Division Manager, and three other individuals.

On September 8, 2017, Richard sent an email to Cole, writing that:

> Bill Mullen called me this morning to tell me that his doctors do not want him returning to work next week as he is still short of breath and has low oxygen levels in his blood. Bill claims his Drs are ok with him working from home and not going on short term disability. I said I want to think about that over the weekend but strongly recommended that go on disability and get his health in order. That will be my answer on Monday but would be interested in your thoughts. Sounds like this will be a two to three week recovery period which according to Bill is longer than originally anticipated.[7]

In September 2017, Richard and Cole conducted an analysis ranking Mullen and Bono in five categories.[8] The form requires scores from 1-5 without written comments; Bono's scores were higher in all categories.[9] Mullen was notified on October 17, 2017, that his employment would end on December 16, 2017. On December 18, 2017, Plaintiff began employment with Thompkins Vist Bank. Mullen contends that he was selected for termination because Wells Fargo has a practice and policy of preferring the hiring and promotion of women, particularly into management-level positions, and because of his disabilities and related FMLA leave.

## II. LEGAL STANDARD

"The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[10] A court will award summary judgment on a claim or part of a claim where "there is no genuine dispute as to any material fact

---

[6] Defs.' Mot. Summ. J. at Ex. P [Doc. No. 27-2].

[7] Defs.' Mot. Summ. J. at Ex. Q [Doc. No. 27-2]; Defs.' Statement of Facts at ¶ 56 [Doc. No. 27-1].

[8] Defs.' Mot. Summ. J. at Exs. R, S [Doc. No. 27-2].

[9] Defs.' Mot. Summ. J. at Exs. R, S, U [Doc. No. 27-2].

[10] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

and the movant is entitled to judgment as a matter of law."[11] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[12] A dispute is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[13]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[14] Further, "a court may not weigh the evidence or make credibility determinations."[15] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[16] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[17] If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[18]

## III. DISCUSSION

### A. Assessing Employment Discrimination Cases

A plaintiff may pursue a claim for employment discrimination under either the mixed-motive theory set forth in *Price Waterhouse v. Hopkins*[19] or the pretext theory set forth in *McDonnell Douglas Corp. v. Green*.[20]

---

[11] Fed. R. Civ. P. 56(a).

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[13] *Id.*

[14] *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citation omitted).

[15] *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1988).

[16] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[17] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

[18] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[19] 490 U.S. 228 (1989).

[20] 411 U.S. 792 (1973). *See Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008).

In a mixed-motive case, the plaintiff "may show that an employment decision was made based on both legitimate and illegitimate reasons."[21] For claims brought under the ADA, a plaintiff must be able to show direct evidence of discrimination,[22] while in Title VII and FMLA retaliation cases either direct or circumstantial evidence may be used to prove that the plaintiff's sex was a motivating factor for the defendant.[23] The plaintiff must first show that sex, disability, or use of FMLA leave played a motivating part in the employment decision, after which the burden shifts to the defendant to show that it would have taken the same action without considering the impermissible factor.[24]

In a pretext case, the *McDonnell Douglas* burden-shifting framework applies, under which the plaintiff first must establish a prima facie case.[25] "In order to make out a *prima facie* [discrimination] case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability."[26] To make out an ADA or FMLA retaliation claim, "a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between

---

[21] *Makky*, 541 F.3d at 213.

[22] *See Wright v. Providence Care Ctr, LLC*, 822 F. App'x 85, 90 (3d Cir. 2020).

[23] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003) (discussing the evidentiary requirement for cases under Title VII); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (illustrating that circumstantial evidence may be used in FMLA retaliation cases).

[24] 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B); *Makky*, 541 F.3d at 213–14.

[25] *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (ADA); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (Title VII); *Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 653 (W.D. Pa. 2018) ("As with discrimination claims, retaliation claims under the ADA are analyzed under the *McDonnell Douglas* framework.") (citing *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)); *Mascioli v. Arby's Rest. Grp., Inc.*, 610 F. Supp. 2d 419, 433 (W.D. Pa. 2009) (FMLA). The same standard applies when there is a reduction in force. *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006) (internal citations omitted).

[26] *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998) (quoting *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

the employee's protected activity and the employer's adverse action.'"[27] "To establish causation in a pretext case, a plaintiff must show that consideration of a protected characteristic was a 'determinative factor' in the plaintiff's adverse employment action."[28]

In Title VII cases, the plaintiff may establish a prima facie case of discrimination by showing that "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he sought to retain; (3) the plaintiff suffered an adverse employment action, e.g., termination of his employment; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination."[29]

To establish that the circumstances surrounding an adverse employment action could give rise to an inference of intentional discrimination,

> a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action.[30]

Under the ADA, the FMLA, and Title VII, "[i]f the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse

---

[27] *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)); *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (quoting *Lichtenstein.*, 691 F.3d at 302) ("To succeed on an FMLA retaliation claim, a plaintiff must show that '(1) []he invoked h[is] right to FMLA-qualifying leave, (2) []he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights.").

[28] *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 237 (3d Cir. 2016) (quoting *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir. 2000)).

[29] *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing; *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

[30] *Greene*, 557 F. App'x at 195 (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n.7 (3d Cir. 2003)).

employment decision."[31] A defendant "answers its relatively light burden" of production by "introducing evidence which, taken as true, would permit the conclusion that there was a . . . [legitimate] reason for the unfavorable employment decision."[32]

"Once the defendant has satisfied its burden of production at the second stage of the *McDonnell Douglas* tripartite framework, a court's analysis turns to the third and final aspect of the inquiry."[33] "At this point, the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext."[34] "[A] plaintiff may defeat a motion for summary judgment . . . by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"[35]

**B. ADA and FMLA Claims**

Mullen does not pursue a mixed-motive theory under the ADA or FMLA, and the Court will analyze these claims solely under the *McDonnell Douglas* framework.[36] With regard to the

[31] *Mascioli*, 610 F. Supp. 2d at 433 (citing *Simpson v. Kay Jewelers Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998)).

[32] *Fuentes*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

[33] *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412 (3d Cir. 1999).

[34] *Id.*

[35] *Id.* at 413 (quoting *Fuentes*, 32 F.3d at 764; *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)).

[36] For purposes of the ADA, Mullen has not adduced direct evidence of discrimination. A statement such as the email from Richard to Cole that "can as easily be understood as an expression of concern for an employee who recently returned from a significant medical leave[] does not clear the 'high hurdle' of proof to constitute direct evidence of discrimination." *Wright*, 822 F. App'x at 91 (quoting *Anderson v. Wachovia Morg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010). Although the email shows that Mullen's disability and leave status were discussed near the time of the employment decision and therefore constitutes circumstantial evidence, because it "does not say that [he] viewed [Mullen] as too disabled to work or that [Mullen's] disabled status put [his] job at risk," Mullen cannot produce the direct evidence necessary to proceed under the mixed-motive theory. *Id*. at 90 (citation omitted).

prima facie case, Wells Fargo does not dispute that Mullen is disabled within the meaning of the ADA or that he was qualified to perform the essential functions of his job. Wells Fargo does dispute that Mullen was terminated because of his disability. In other words, Wells Fargo contends that Mullen cannot show that his disability was a determinative factor in the decision to terminate his employment, or a causal connection between the use of disability-related leave and his termination.

Mullen has produced evidence that he was in a serious head-on collision on April 25, 2016, while driving to a sales call. As a result, Mullen was out of work from April 25 until September 18, 2016. In October and November 2016, Mullen required surgery related to his injuries from the car crash; he was out of work for a few days and then worked from home for several weeks, returning to the office in November. In January 2017, southern New Jersey was removed from Mullen's territory, resulting in lost sales and income. In April 2017, Mullen's supervisor, Massey, told Mullen that Cole wanted Mullen placed on a performance improvement plan, but Massey refused to do so.[37] In May 2017, Mullen's administrative assistant was reassigned to report directly to Bono, with a "dotted line" report to Mullen.[38] On August 31, 2017, Mullen required leave for treatment of blood clots related to the collision, returning to the office on September 25, 2017. On September 8, 2017, Richard sent the email to Cole, reporting that he had advised Mullen to go on disability. Cole and Richard completed their ratings of Bono and Mullen in September 2017. Three weeks after returning to the office, on October 17, 2017, Mullen was notified of his termination, effective December 16, 2017.

---

Because the FMLA claims will proceed under the pretext theory, it is not necessary to address at this time whether Mullen can succeed under a mixed-motive theory.

[37] Pl.'s Statement of Facts at ¶¶ 115–22 [Doc. No. 29-3]. Cole denied that he discussed placing Mullen on a performance improvement plan.

[38] Mullen Dep., Defs.' Mot. Summ. J. Ex. D at 43 [Doc. No. 27-2].

Mullen also has produced evidence that his supervisors were aware that Mullen's disability and his FMLA leaves affected his productivity, and that Cole discussed the issue with Massey and with human resources.[39] Before completing the reviews of Bono and Mullen, Cole and Richard discussed the fact that Mullen had taken medical leave, and Richard had covered for Mullen during the 2017 leave.[40]

Significantly, the decision to terminate Mullen was made during, or within a few days after, an FMLA leave, which constitutes an unduly suggestive proximity between the leave and the decision. Such proximity "is sufficient standing alone to create an inference of causality and defeat summary judgment."[41] Wells Fargo argues that the decision to eliminate Mullen's position constituted an intervening event that broke the chain of temporal proximity.[42] But the question is whether the decision to retain Bono rather than Mullen was impermissibly influenced by Mullen's status, and Plaintiff has provided sufficient evidence of that for purposes of stating a *prima facie* case.

The burden therefore shifts to Wells Fargo to articulate a non-discriminatory rationale behind Mullen's termination, which it has done. Wells Fargo contends that Richard and Cole concluded that Bono had a higher aptitude for non-credit products and working with internal partners on client calls.[43] Wells Fargo contends that Richard and Cole were instructed not to confer with each other about the evaluations and not to consider characteristics such as

---

[39] Pl.'s Statement of Facts ¶¶ 100-01 [Doc. No. 29-3].

[40] Pl.'s Statement of Facts ¶¶ 91, 98, 99, 156, 157 [Doc. No. 29-3].

[41] *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

[42] *Kontoulis v. Enclara Pharmacia, Inc.*, No. 18-3864, 2020 WL 6321568, at * 9 (E.D. Pa. Oct. 28, 2020) (holding that an act of misconduct between the date of the protected activity and the adverse employment action may destroy inference of retaliation).

[43] *See, e.g.*, Richard Dep., Defs.' Opp. Pl.'s Mot. Ex. H at 77, 83-85 [Doc. No. 28-1]; Cole Dep., Defs.' Opp. Pl.'s Mot. Ex. D at 232, 243-245 [Doc. No. 28-1].

disability.[44] Wells Fargo also contends that Bono's uninterrupted years of employment gave her an advantage over Mullen.[45] These reasons are sufficient to meet Well Fargo's burden of production in the second part of the *McDonell Douglas* framework.

As Wells Fargo has articulated a non-discriminatory rationale for Mullen's termination, Mullen must be able to produce evidence from which a reasonable jury could conclude that the articulated reasons were simply pretext for discrimination based on disability or retaliation for use of FMLA leave.[46] Here it is relevant that the assessment of Mullen and Bono included no explanation for the scores. "[L]ow evaluation scores may be a pretext for discrimination," particularly when the evaluation criteria are subjective.[47] Although a factfinder certainly could credit the reasons provided by Richard and Cole after the fact, they were not part of the evaluations themselves and therefore might be viewed as *post hoc* justifications.[48] In addition, Cole acknowledged that he had a better opportunity to observe Bono because of the amount of time Mullen was absent on medical leave.[49] Drawing all inferences in Mullen's favor, a

[44] Defs.' Statement of Facts ¶¶ 66-67 [Doc. No. 27-1].

[45] Defs.' Statement of Facts ¶¶ 71 [Doc. No. 27-1].

[46] To the extent Mullen asserts a claim of interference with his FMLA rights, he must show that (1) he "was an eligible employee under the FMLA," (2) his "employer was subject to the FMLA's requirements," (3) he "was entitled to FMLA leave," (4) he "gave notice to [his] employer of [his] intention to take FMLA leave," and (5) he "was denied benefits to which [he] was entitled under the FMLA." *Soutner v. Penn State Health*, 841 F. App'x 409, 413 (3d Cir. 2021) (citing *Ross*, 755 F.3d at 191-92). Although "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights," Mullen has not shown that he requested leave before his termination. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).

[47] *Tomasso*, 445 F.3d at 706.

[48] *See Fuentes*, 32 F.3d at 765. Mullen argues that he had been in the BAM position for longer than Bono and had helped train her. Mullen also produced evidence that his score in the 2015 performance review was higher than Bono's. Both Mullen and Bono achieved an overall rating of "Performing" on their 2016 performance reviews. Pl.'s Statement of Facts at ¶¶ 36-39 [Doc. No. 26-1]. Mullen also argues that his performance was superior to Bono's in certain metrics.

[49] Pl.'s Statement of Facts ¶ 181 [Doc. No. 29-3]. Wells Fargo argues that Bono had also taken FMLA leave on three separate occasions for the birth of her children in 2005, 2007, and 2010, but not since. Bono Dep. at 59-60, Defs.' Mot. Summ. J. Ex I [Doc. No. 27-2]. A factfinder could determine that planned maternity leaves, taken years before the events at issue, were of a different character than Mullen's leaves taken close in time to his termination.

reasonable factfinder could "disbelieve [Wells Fargo's] articulated legitimate reasons,"[50] and conclude that Mullen's disabilities were a determinative factor in the decision or that the "use of FMLA leave was a negative factor in the employment decision."[51]

**C. Title VII Claims**

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to compensation or terms, conditions, or privileges of employment on the basis of race or gender."[52] Mullen argues that Wells Fargo selected him for termination despite his superior qualifications as part of a gender diversity initiative. Importantly, diversity initiatives are not improper, and the existence of a diversity initiative raises no presumption of impropriety;"[a]n employer has every right to be concerned with the diversity of its workforce, and the work environment."[53] Indeed, the Supreme Court has written favorably in support of private-sector diversity initiatives as a legitimate business consideration, noting that the benefits of these programs "are not theoretical but real, as major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints."[54]

Therefore, "[u]nless a plaintiff can demonstrate that a defendant employer's 'approach to diversity had some negative impact upon his individual employment situation, the mere existence of a policy promoting diversity awareness is not evidence of discrimination' under

---

[50] *Lichtenstein*, 691 F.3d at 302 (quoting *Fuentes*, 32 F.3d at 763).

[51] *Egan v. Del. River Port Auth.*, 851 F.3d 263, 275 (3d Cir. 2017).

[52] *Collins v. Kimberly-Clark Pa., LLC*, 247 F. Supp. 3d 571, 588 (E.D. Pa. 2017) (citing 42 U.S.C. § 2000e–2(a)), *aff'd*, 708 F. App'x 48 (3d Cir. 2017).

[53] *Iadimarco v. Runyon* 190 F.3d 151, 164 (3d Cir. 1999).

[54] *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003).

Title VII."[55] In other words, there must be evidence "connecting [Wells Fargo's] diversity initiative, or any purported . . . gender preferences" to the decision to retain Bono instead of Mullen, beyond the fact that a woman was selected for retention instead of a man.[56]

Mullen points to a January 26, 2017 presentation in which Massey included as a "Point of Pride" that the Northeast Group (which included Mullen's and Bono's territories) had "achieved 50% diversity in management positions."[57] In addition, the performance reviews of managers, including Cole, evaluate their efforts to promote diversity in the workplace, but Wells Fargo maintains that this metric was satisfied by a diverse candidate pool and a diverse interview panel, not by which candidate was ultimately selected.[58]

Mullen has not demonstrated that Wells Fargo's diversity initiatives constituted a discriminatory policy that in effect required a certain demographic representation and specifically resulted in Mullen's termination.[59] Although Mullen argues that he was more qualified for the position than Bono, he has not produced evidence from which a reasonable factfinder could conclude that discrimination on the basis of sex motivated the decision. The only other evidence Mullen presented was that at the time Bono was considered for the BAM position, Massey told him that he preferred a woman in the position "if we could get one."[60] This isolated and ambiguous comment, made several years before the decision to terminate Mullen,

---

[55] *Musa v. Soar Corp.*, No. 13-2847, 2014 WL 6809019, at *7 (E.D. Pa. Dec. 1, 2014) (quoting R*eed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 185 (D. Del. 2001)).

[56] *Tomaszewski v. City of Phila.*, 460 F. Supp. 3d 577, 594 (E.D. Pa. 2020).

[57] Pl.'s Statement of Facts ¶ 57 [Doc. No. 29-3]. Massey did not participate in the decision to terminate Mullen's employment.

[58] Pl.'s Statement of Facts at ¶¶ 41-49, 51-53 [Doc. No. 29-3]; Defs.' Opp. Pl.'s Mot. Ex. C [Doc. No. 28-1]; Cole Dep., Defs.' Opp. Pl's Mot. Ex. D at 67 [Doc. 28-1]. Wells Fargo also argues that discrimination cannot be inferred because Cole and Richard are men. Defs.' Opp. Pl.'s Mot. [Doc. No. 28] at 16-17. The Court does not base its decision on this argument.

[59] *See Pierce v. City of Phila.*, No. 17-5539, 2018 WL 6832093 at * 10 (E.D. Pa. Dec. 28, 2018).

[60] Mullen Dep., Pl.'s Opp. Defs.' Mot. Ex. 1 at 34 [Doc. No. 29-4].

by someone who was not part of the decision, does not give rise to an inference of discrimination on the basis of sex. This conclusion is buttressed by the fact that when Bono resigned from Wells Fargo in 2018, her position was filled by a man.[61] The Court will deny Mullen's motion for partial summary judgment and grant Wells Fargo's motion for summary judgment on the Title VII claim.

## IV. CONCLUSION

Mullen's motion for partial summary judgment will be denied. Wells Fargo's motion for summary judgment will be granted as to the claims of discrimination on the basis of sex and denied as to claims of disability discrimination and retaliation under the FMLA.[62] An order will be entered.

[61] Defs.' Statement of Facts ¶ 79 [Doc. No. 27-1].

[62] Wells Fargo also argues that Mullen failed to mitigate his damages by failing to pursue substantially equivalent work, including a position with Wells Fargo as a business development officer. However, Wells Fargo has not explained how Mullen's current role, which he secured immediately after the end of his employment at Wells Fargo, is not substantially equivalent to his previous role. *Compare Tai Van Le v. Univ. of Pa.*, 321 F.3d 403, 407 (3d Cir. 2003) (finding that a jury's reduction of Title VII damages was appropriate where the plaintiff refused job-hunting assistance, "did not attempt to find work for a significant period of time following his dismissal, and only half-heartedly began after [his] amended lawsuit was filed . . . .") *with Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 85 (3d Cir. 2009) ("'Substantially equivalent' employment affords 'virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated.'") (quoting *Booker v. Taylor Milk Co.*, 64 F.3d 860, 866 (3d Cir. 1995). These concepts are not appropriate to resolution at summary judgment.